# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EASTMAN CHEMICAL COMPANY,     )
                                      )
        Plaintiff,             )
                                      )
v.                               )   Civ. Action No. 09-971-LPS-CJB
                                      )
ALPHAPET INC., INDORAMA HOLDINGS     )
ROTTERDAM B.V., INDORAMA     )
POLYMERS ROTTERDAM B.V.,     )
INDORAMA POLYMERS WORKINGTON     )
LTD., and INDORAMA POLYMERS PCL,     )
                                      )
        Defendants.           )

## REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)[1]

In this action, Plaintiff Eastman Chemical Company ("Eastman" or "Plaintiff") has filed

an Amended Complaint alleging patent infringement (Count One) against Defendants AlphaPet,

Inc. ("AlphaPet") and Indorama Polymers PCL ("IRP"). (D.I. 15) The Amended Complaint also

alleges breach of contract (Count Two) against IRP, as well as Defendants Indorama Holdings

Rotterdam B.V. ("IHR"), Indorama Polymers Rotterdam B.V. ("IPR") and Indorama Polymers

Workington Ltd. ("IPW"), and alleges trade secret misappropriation against all Defendants

(Count Three). Before the Court is Defendants' motion to dismiss the breach of contract and

trade secret misappropriation claims pursuant to Fed. R. Civ. P. 12(b)(6) (D.I. 19).[2]

---

[1]     With regard to a motion to dismiss filed pursuant to Rule 12(b)(6), absent unanimous consent of the parties to the jurisdiction of a United States Magistrate Judge, a Magistrate Judge's authority as to the resolution of the motion is limited to making a Report and Recommendation to the District Court. 28 U.S.C. § 636(b)(1)(B); D. Del. LR 72.1(a)(3).

[2]     Defendant IRP has separately moved to dismiss all claims against it for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2). That motion is pending, but briefing

For the reasons that follow, I recommend that the Court GRANT-IN-PART Defendants' motion by dismissing without prejudice the breach of contract claim asserted against IRP and the claim for breach of implied contractual provisions made against all Defendants, but otherwise I recommend that the Court DENY the motion.

## I.  BACKGROUND

Plaintiff is a Delaware corporation engaged principally in the manufacture and development of chemicals, fibers, and plastics, including polyethylene terephthalate ("PET"). (D.I. 15 at ¶ 2; D.I. 28 at 1)  Defendants are all directly or indirectly related corporations whose business includes, *inter alia*, the manufacture and development of PET products.  (D.I. 15 at ¶ 6; D.I. 20 at 1–2)  In March 2008, Eastman entered into a Master Business Sale Agreement ("MBSA") with certain of Defendants,[3] and into a Technology License Agreement ("TLA") with Defendants IHR, IPR, and IPW.  (D.I. 15 at ¶ 13)  Under the TLA, these three Defendants received a nonexclusive license to certain Eastman trade secrets, which would assist them in making certain PET polymers and compositions in Europe.  (*Id.* at ¶¶ 16–18)  The TLA is governed by Delaware law.  (*Id.* at ¶ 25)

Pursuant to the TLA and MBSA, Eastman transferred certain of its employees to IHR, IPR, and IPW.  (D.I. 15 at ¶ 15)  The TLA prohibits IHR, IPR, and IPW from using, transferring, making any product with, or using or modifying any process with Eastman non-licensed trade

---

has been stayed pending resolution of Plaintiff's motion for jurisdictional discovery.  (D.I. 27)  The Court addresses Plaintiff's motion for jurisdictional discovery in a separate Memorandum Opinion and Order, which contain additional background about this case not discussed herein.

[3]      Neither party has submitted a copy of the MBSA, and it is unclear from the record who the parties to the MBSA are.

secrets, or soliciting such information from the transferred employees. (*Id.* at ¶¶ 19–24) Some of those non-licensed trade secrets relate to the manufacture and formulation of PET products using Eastman's melt-to-resin IntegRex™ technology. (*Id.* at ¶ 38) During 2009, Defendant AlphaPet completed a melt-to-resin manufacturing plant in Decatur, Alabama. Plaintiff alleges that "former Eastman employees working for one or more [of IHR, IPR, and IPW], at the direction of one or more of the Defendants, traveled from Europe to Alabama in mid-2009 to assist in starting up production at the AlphaPet facility." (*Id.* at ¶ 37) These same transferred employees had also "assisted during the mid-2006 to early-2007 start-up of Eastman's advanced polyester melt phase processes at its IntegRex™ PET manufacturing plant in Gaston, South Carolina." (*Id.*)

Plaintiff alleges that "these former Eastman employees or other former Eastman employees, at the direction of one or more of the Defendants, improperly disclosed Eastman's confidential, proprietary, and trade secret information relating to the manufacture of PET, including information related to Eastman's IntegRex™ PET technology, to Defendants AlphaPet and IRP during the design, start-up or operation of AlphaPet's melt-to-resin PET manufacturing process, in contravention of the TLA." (*Id.* at ¶ 39) Plaintiff alleges that these transferred employees therefore misappropriated non-licensed trade secrets by disclosing them in breach of the TLA, and alleges that these non-licensed trade secrets, having been obtained by certain Defendants, were then used to create and/or operate the Decatur facility. (*Id.* at ¶¶ 39–41) This misappropriation allegedly injured Eastman "due to Defendants' improper head start in producing competing products at the AlphaPet facility, unjustified marketplace competition by these products, and unfair and uncompensated use of Eastman's technology." (*Id.* at ¶ 67)

## II.     STANDARD OF REVIEW

3

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In recent years, the United States Supreme Court has clarified and refined its jurisprudence concerning the standard of pleading required under Rule 8. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949–53 (2009).

Prior to 2007, district courts were permitted to dismiss a complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). The Supreme Court, concerned that this "no set of facts" language could be read to suggest that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of [undisclosed] facts to support recovery," rejected that test in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *Id.* at 561 (internal quotations and citations omitted) Instead, *Twombly* required a plaintiff setting forth an antitrust claim for a violation of Section I of the Sherman Act to allege sufficient "factual matter (taken as true) to suggest" liability for the misconduct alleged. *Id.* at 556. Such a complaint need not contain "detailed factual allegations," but it must include "more than labels and conclusions" or the "formulaic recitation of the elements of a cause of action." *Id.* at 555. The Supreme Court did "not require heightened fact pleading of specifics," but rather held that a well-pleaded complaint should provide "enough facts to state a claim to relief that is plausible on its face," which "simply calls for enough fact to raise a reasonable expectation that discovery [would] reveal evidence" for such a claim. *Id.* at

4

556, 570. In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009), the Supreme Court extended these standards to all civil complaints. *Id.* at 1953.

The Third Circuit has determined that after *Twombly* and *Iqbal*, district courts faced with a motion to dismiss for failure to state a claim should perform a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). First, the district court should separate the factual and legal elements of a claim, accepting any well-pleaded facts as true, but disregarding any legal conclusions. *Id.* Second, the district court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 129 S.Ct. at 1950). Determining whether a claim is plausible is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949). In so doing, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations omitted)).

A well-pleaded complaint may not be dismissed simply because "it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). While the Supreme Court has clearly admonished that conclusory allegations are insufficient to satisfy the pleading standard required by Rule 8, "the Supreme Court did not strike [the phrase 'upon information and belief'] from the lexicon." *Smith v. Harvey*, No. 08 C 816, 2010 WL 1292473, at *4 (N.D. Ill. Mar. 29, 2010). As such, the touchstone of a court's inquiry in this regard is plausibility, not

probability, and whether a defendant is on notice of a claim for relief, not whether that claim has been pled with specificity or particularity. *See, e.g., Iqbal*, 129 S.Ct. at 1949; *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (noting that "*Twombly*'s plausibility standard" does *not* function as a "probability requirement in complex cases").

## III.  DISCUSSION

### A.  Trade Secret Misappropriation

Defendants argue that Plaintiff's claim for trade secret misappropriation fails to satisfy the pleading standard of Rule 8 in three principal respects. First, Defendants assert that the Amended Complaint fails to identify which of the Defendants allegedly obtained Eastman's trade secrets, and which individuals were involved in the allegedly illicit disclosure and use of that information. (D.I. 20 at 5–7) Second, Defendants argue that the description of the trade secrets that were allegedly used or disclosed is "so broad as to be meaningless." (*Id.* at 7) Finally, Defendants contend that "Eastman still fails to adequately plead that any [particular] defendant actually used or disclosed" any trade secrets. (*Id.* at 8) Viewing Plaintiff's misappropriation claim and the associated facts in the light most favorable to Plaintiff, the Court finds that Defendants have not shown that this claim should be dismissed pursuant to Rule 8.

The Delaware Uniform Trade Secrets Act ("DUTSA") governs claims for trade secret misappropriation.[4] A "trade secret" is information that "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by,

---

[4]  For purposes of this analysis, the Court considers caselaw from other states that have adopted the Uniform Trade Secrets Act to be persuasive authority. *See* 6 Del. C. § 2008 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."); *Accenture Global Servs. GmbH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 662 n.6 (D. Del. 2008).

other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 6 Del. C. § 2001(4).

The DUTSA defines trade secret misappropriation as:

> a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> b. Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> 1. Used improper means to acquire knowledge of the trade secret; or
>
> 2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [secret] was:
>
> A. Derived from or through a person who had utilized improper means to acquire it;
>
> B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .

6 Del. C. § 2001(2). In other words, misappropriation can occur in several alternative ways—namely, via acquisition, disclosure, and/or use. The statute is disjunctive, meaning that a defendant who engages in only one of these activities will be liable for misappropriation.

As noted above, the first step in analyzing whether Plaintiff has satisfied Rule 8 is to separate the factual and legal elements of the claim. The Court has highlighted some of Plaintiff's key factual allegations, which it must accept as true for purposes of this motion:[5]

---

[5] *See, e.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.")

- In March 2008, Eastman and Defendants IHR, IPR, and IPW entered into the TLA, which is a license to certain technology and intellectual property relating to the manufacture of PET products outside of the United States. (D.I. 15 at ¶¶ 13, 17)

- The TLA did not, however, license all of Eastman's trade secrets. The TLA excluded certain trade secrets, including Eastman's IntegRex™ PET technology, from the universe of licensed trade secrets. (*Id.* at ¶¶ 13, 20)

- Eastman transferred certain employees to one or more Defendants pursuant to the TLA and the related MBSA. (*Id.* at ¶ 15) Certain of these employees had gained knowledge of unlicensed trade secrets relating to Eastman's IntegRex™ technology during the start-up of Eastman's IntegRex™ plant in South Carolina. (*Id.* at ¶ 37)

- Sometime after the TLA was executed, those former Eastman employees who had previously worked at Eastman's South Carolina plant and who now worked for "one or more" of Defendants IHR, IPR, and IPW, "at the direction of one or more of the Defendants, traveled from Europe to Alabama in mid-2009 to assist in starting up production at the AlphaPet facility."[6] (*Id.*)

- Defendant AlphaPet then took the information about Eastman's IntegRex™ PET technology from these same former Eastman employees discussed in the prior paragraph, "or [from] other former Eastman employees," and "used [it] during the design, start-up and/or operation of its melt-to resin manufacturing process without express or implied consent from Eastman." (*Id.* at ¶ 64; *see also id.* at ¶¶ 39–41)

- IHR, IPR, and IPW were specifically prohibited under the TLA from using or transferring any Eastman trade secrets that had not been licensed, such as IntegRex™ technology, and likewise were prohibited from soliciting any information about unlicensed trade secrets from any transferred employees, or otherwise disclosing or accessing such information. (*Id.* at ¶¶ 19–24)

Plaintiff's factual allegations invoke a familiar tableau that often underlies

misappropriation claims—a former employee improperly discloses trade secret information that

is then used to compete against the former employer. *See, e.g., Orthovita, Inc. v. Erbe*, Civil

Action No. 07-2395, 2008 WL 423446, at *1 (E.D. Pa. Feb. 14, 2008) ("Employee loyalty and

---

[6]     *See also* D.I. 32 at 16 (characterizing the Amended Complaint as alleging that Defendants "directed transferred employees having direct knowledge of Eastman's IntegRex™ PET technology to travel from Europe to Alabama to assist with starting up a plant using [this polyester melt phase] technology").

post-employment competition against the former employer spawn many disputes."). However, this case involves a slight twist on the typical misappropriation fact pattern, in which an employee is fired or resigns and then uses trade secrets from the former employer to start or engage in a competing venture. *See, e.g., Accenture Global Servs. GmbH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 662 n.8 (D. Del. 2008) ("The typical DUTSA case involves allegations that [a] former employee of plaintiff had access to trade secrets in the context of his or her employment . . . and later left to compete directly with plaintiff . . . ."). Instead of terminating employees who then went to compete against Eastman armed with an arsenal of trade secrets, Eastman willingly dispatched its former employees to Defendants, but with the caveat that only certain information, knowledge, and know-how from Eastman could be disclosed to or used by Defendants.

Having outlined and considered the contours of Plaintiff's factual allegations, the Court finds that, as discussed in detail below, Defendants have been given sufficient factual information to provide adequate notice of the plausible grounds for Plaintiff's misappropriation claim under the *Twombly/Iqbal* standard.

**1. Plaintiff's Alleged Failure to Sufficiently Identify the Trade Secret(s) at Issue**

Defendants first challenge the Amended Complaint for allegedly failing to identify any of the trade secrets that Plaintiff contends have been misappropriated. Specifically, Defendants argue that "Eastman's amended complaint continues to vaguely claim that its trade secret(s) is/are 'information relating to the manufacture of PET,'" and that this description is "so broad as to be meaningless." (D.I. 20 at 7 (quoting D.I. 15 at ¶ 38)) However, Defendants' quotation from the

Amended Complaint omits the remainder of the sentence from paragraph 38, which provides that the allegedly misappropriated information is "related to Eastman's IntegRex™ PET technology." (D.I. 15 at ¶ 38) Defendants also ignore the *thirteen* other references in Plaintiff's Amended Complaint to Eastman's IntegRex™ technology, which is the specific "information relating to the manufacture of PET" that is clearly at issue here. It is true that almost every time Plaintiff references the trade secrets at issue in the Amended Complaint, Plaintiff uses the phrase "*including* information related to Eastman's IntegRex™ PET technology," (*see e.g.*, D.I. 15 at ¶¶ 62, 64, 65 (emphasis added)), which suggests that there could be some other unidentified trade secrets also at play in this litigation. But in light of the repeated references to IntegRex™ PET technology in the Amended Complaint, it is clear that Plaintiff has identified the illicit disclosure and use of information relating to that particular type of melt-to-resin technology as the gravamen of its trade secret misappropriation claim.[7]

As such, Plaintiff's claim is distinguishable from that found to be inadequate in *Medafor, Inc. v. Starch Med. Inc.*, No. 09-CV-0441 PJS/FLN, 2009 WL 2163580, at *1 (D. Minn. July 16, 2009), a case cited by Defendants. (D.I. 20 at 7–8). In *Medafor*, "[t]he complaint describe[d] the trade secrets at issue as 'business methodologies, formulas, devices, and compilations of information, including suppliers and customers.'" 2009 WL 2163580 at *1. The *Medafor* complaint provided almost no guidance as to the nature of the alleged trade secret, leaving the

---

[7]     Defendants have not argued that identifying trade secret information by reference to a registered trademark, such as IntegRex™, would be insufficient to identify the nature of the trade secret alleged to have been misappropriated. Indeed, this Court has previously held that information relating to a generic Efudex® product was the sort of "core information" that should be found in a claim for trade secret misappropriation. *See Spear Pharms. Inc. v. William Blair & Co., LLC*, 610 F. Supp. 2d 278, 283–84 (D. Del. 2009); *see also* D.I. 40 at 5.

defendant to guess at which of the legions of its unidentified "methodologies, formulas, devices, and compilations of information" was alleged to have been wrongfully misappropriated. *Id.*

There is no analogously generic description here in Plaintiff's Amended Complaint; instead, the trade secret clearly at the center of this dispute is specifically identified by name more than a dozen times. While Defendants protest that "'information relating to the manufacture of PET' could literally mean anything," Defendants cannot credibly contend that information relating specifically to IntegRex™ technology could likewise mean "literally anything." (D.I. 20 at 8) When trade secrets are identified by reference to a trade name, such as IntegRex™, courts in this circuit have refused to dismiss misappropriation claims. *See, e.g., Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, Civil Action No. 09-3125, 2011 WL 773034, at *4 (D.N.J. Feb. 28, 2011) (refusing to dismiss trade secret claim where the confidential information was identified as "the Delsym® manufacturing process, Delsym® formulations, and other private information concerning Delsym® and related research and development"). Thus, the Court finds that Plaintiff has identified the trade secret at issue so as to satisfy the requirements of Rule 8.

### 2. Plaintiff's Alleged Failure to Identify Who Among Which Defendants Disclosed The Trade Secret

Defendants also argue that Eastman's Amended Complaint fails to comply with Rule 8's pleading requirements because Eastman "does not identify *which former employees* it accuses and *which defendant(s)* these former employees now work for." (D.I. 20 at 6 (emphasis in original)) Plaintiff responds that it has identified those individuals, albeit not by name. As previously noted, Plaintiff's misappropriation claim centers on the actions of a group of employees who are not named in the Amended Complaint, but who assisted in the mid-2006 to

early-2007 start-up of an IntegRex™ PET manufacturing plant in South Carolina. (D.I. 15 at ¶¶ 15, 37) These employees were later transferred from Eastman to IPW, IPR, and IHR, and then were allegedly used by IRP and AlphaPet to set up AlphaPet's PET facility in Alabama. (*Id.*) Plaintiff contends that these former employees disclosed unlicensed trade secret information about the IntegRex™ technology during the creation or operation of the Alabama plant, and that information was thus acquired by one or more of Defendants (none of whom were authorized to acquire such information). (*Id.* at ¶¶ 37–39) Plaintiff further alleges that one or more of the Defendants then used this information to make PET products at AlphaPet's Alabama facility. (*Id.* at ¶ 41) As such, the allegations in the Amended Complaint focus on a finite universe of (1) individuals who were transferred from Eastman to Defendants pursuant to the TLA, who also (2) worked on the IntegRex™ technology in connection with the start-up of Eastman's South Carolina facility, and who also (3) traveled to Alabama as part of the development of AlphaPet's Alabama facility.[8]

While it is unclear to the Court why the Plaintiff did not identify these individuals by name in the Amended Complaint, the question before the Court is not *why* Plaintiff did not, but rather whether Rule 8 requires Plaintiff to do so. Defendants cite no authority from Delaware or any other jurisdiction that requires a plaintiff to identify the individual who allegedly

---

[8]     It is true that, as it did with respect to the nature of the trade secret at issue, Plaintiff at times uses language in the Amended Complaint that could be seen as trying to hedge its bets as to who is in the class of possible trade secret misappropriators. To that end, Plaintiff identifies potential wrongdoers as not only the former Eastman employees with the shared South Carolina/Alabama history, but also a group of "other former Eastman employees." (D.I. 15 at ¶ 39) Yet even if one takes into account this somewhat expanded class of individuals, it is a group that is still significantly limited to only (1) individuals who formerly worked at Eastman and who now work for one of Defendants and who (2) were involved in the creation or operation of the Alabama plant.

communicated or used a trade secret *by name*. On the contrary, the *Twombly* Court specifically

endorsed the use of "'either direct *or inferential* allegations regarding all the material elements

necessary to sustain recovery.'" *Haspel v. State Farm Mut. Auto. Ins. Co.*, 241 Fed. App'x 837,

839 (3d Cir. 2007) (quoting *Twombly*, 127 S.Ct. at 1969) (emphasis added). Even if Defendants

have to engage in an inferential step to determine the identities of the former employees in

question, that would not be grounds to dismiss the Amended Complaint according to *Twombly*.

Defendants rely primarily on *Spear Pharmaceuticals, Inc. v. William Blair & Co., LLC*,

610 F. Supp. 2d 278, 283 (D. Del. 2009), for the proposition that "'the identity of the individual'

alleged to have disclosed confidential information [is] 'core information' under the *Twombly*

analysis for a claim of trade secret misappropriation." (D.I. 20 at 7) In *Spear*, this Court denied

a motion to dismiss a trade secret misappropriation claim, noting that the complaint at issue there

"includes allegations substantial enough to justify opening the door to discovery." 610 F. Supp.

2d at 283. Among those allegations was the name of a single individual (Brian Scullion) who

allegedly leaked information in breach of a confidentiality agreement. *Id.* However, the name of

the individual involved in the "leak" in *Spear* was just one part of a litany of "core" facts which,

taken together, provided sufficient notice of the contours of a trade secret misappropriation

claim. These categories included: (1) the time frame during which confidential information was

leaked, (2) the content of that information, (3) an opportunity and motive for leaking the

information, (4) the manner in which the leaked information was used to the plaintiff's detriment;

and (5) a sequence of events supporting a connection between the defendants and the alleged

harm. *Id.* The *Spear* Court gave no indication that any one of these "core" categories was more

important than any other, and likewise did not suggest that any one piece of information (such as

13

the identity of the individual disclosing the trade secret) was essential to surviving a challenge under Rule 8.[9]

The Court thus declines to read *Spear* as establishing a brightline rule that a trade secret misappropriation claim satisfies the Rule 8 requirements if and only if the plaintiff "names names" of those responsible for misappropriation. As the Third Circuit has noted, even after *Twombly*, plaintiffs are not required to present "detailed factual allegations" in a complaint in order to cross "the line from conceivable to plausible." *Phillips*, 515 F.3d at 231, 234 (internal quotations omitted); *accord Zep, Inc. v. First Aid Corp.*, No. 09 CV 1973, 2010 WL 1195094, at *7 (N.D. Ill. Mar. 19, 2010) (rejecting arguments that a complaint failed to allege "'who, what, where, when or how [a defendant] breached the contract or used trade secrets,'" where the court was "satisfied" that defendants could "deduce the grounds upon which [plaintiff's] claims rest").

Under Rule 8, even if a complaint is somewhat "lacking in specificity," that is not a reason to dismiss the complaint, unless that lack of specificity deprives the defendants of fair notice of the claim itself.[10] *Zep, Inc.*, 2010 WL 1195094 at *8. In this case, although it has not

---

[9]     Indeed, Plaintiff's Amended Complaint provides information falling into each of the categories identified in *Spear*. (D.I. 32 at 16) It sets forth: (1) a general description of the individuals involved in the alleged "leak"; (2) the time-frame of the alleged leak (mid-2009 and after); (3) the content of that alleged leak (information about IntegRex™ PET technology); (4) an opportunity and motive for the alleged leak (the transfer of knowledgeable Eastman employees to competitors of Eastman and their travel to the Alabama facility, giving Defendants an "improper head start" in producing competing products there); (5) the manner in which the leaked information was used to Plaintiff's detriment (in the design, start-up, and/or operation of the Alabama facility); and (6) a sequence of events supporting a connection between Defendants and the alleged harm (the above-referenced transfer of Eastman employees knowledgeable about IntegRex™ technology and their work at the Alabama PET plant). (*See generally* D.I. 15)

[10]     This notice pleading standard of Rule 8 is distinct from the heightened pleading standard of Rule 9—which requires the sort of specificity that Defendants at times appear to demand here. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with

14

identified by name the specific individuals who allegedly leaked the prohibited information, the

totality of information Plaintiff provides amounts to much more than just a "formulaic recitation

of the elements" of a trade secret misappropriation claim. *Twombly*, 550 U.S. at 555.

### 3. Plaintiff's Alleged Failure to Identify How Trade Secrets Were Used or Disclosed

Finally, Defendants also contend that "Eastman still fails to adequately plead that any

defendant actually *used or disclosed*" any unlicensed trade secret information. (D.I. 20 at 8

(emphasis added)) However, in the Amended Complaint, Plaintiff specifically alleges that:

- "Defendants [IHR, IPR, and IPW] *disclosed Eastman's confidential and proprietary trade secret information* to AlphaPet or IRP during the design, start-up or operation of AlphaPet's melt-to-resin manufacturing process, including information related to Eastman's IntegRex™ PET technology[.]" (D.I. 15 at ¶ 62 (emphasis added))

- "Defendant IRP . . . obtained trade secret information and . . . *used* [that information] without express or implied consent from Eastman." (*Id.* at ¶ 63 (emphasis added))

- Defendant AlphaPet "improperly *used* information . . . related to Eastman's IntegRex™ PET technology[] during the design, start-up and/or operation of its melt-to-resin manufacturing process without express or implied consent from Eastman." (*Id.* at ¶ 64 (emphasis added))

This plain language of the Amended Complaint clearly alleges both use and disclosure of trade

secret information relating to the IntegRex™ technology, and does so with sufficient specificity

in light of the other allegations in the Amended Complaint to meet the *Twombly/Iqbal* standard.

Defendants rely primarily on *Accenture Global Services GmbH v. Guidewire Software

Inc.*, 581 F. Supp. 2d 654 (D. Del. 2008) in support of their position to the contrary. (D.I. 20 at

8–9) However, *Accenture* is distinguishable from the present facts. In that case, the plaintiff

---

particularity the circumstances constituting fraud or mistake."); *Osteotech, Inc. v. Biologic, LLC*, No. 07-1296 (JAP), 2008 WL 686318, at *5 (D.N.J. Mar. 7, 2008) (explaining that "there is no heightened pleading standard for a misappropriation claim").

("Accenture") and defendant ("Guidewire") were competitors in the consulting and technology services industry, and each provided, among other things, software and services to aid insurance companies in information management and processing. 581 F. Supp. 2d at 657. In 2000, Accenture provided an assessment to a potential third-party customer, CNA, which included information about Accenture's proprietary systems and software. *Id.* at 658. Accenture thereafter installed certain test software at CNA. *Id.* CNA ultimately declined to purchase Accenture's system, and instead informed Accenture that it would purchase and develop a similar system with Guidewire. *Id.* Accenture later filed a complaint against Guidewire alleging, *inter alia*, trade secret misappropriation. *Id.* at 657. Guidewire moved to dismiss the trade secret claim pursuant to Rule 12(b)(6). *Id.*

This Court dismissed the trade secret claim in the *Accenture* complaint after finding that it was based solely on "conclusions" and a "formulaic recitation of the elements of a cause of action." *Id.* at 663. This Court further found that Accenture did not allege that any protected information had been obtained through improper means, because Accenture had alleged only that it "worked with CNA, during which time it learned about Guidewire; Accenture installed software on CNA's computers in late-2002; CNA informed Accenture in 2003 that its bid had lost; and Accenture later learned that Guidewire had the winning bid." *Id.* The *Accenture* Court highlighted Accenture's "assum[ption], based upon what it feels was 'a surprisingly quick development trajectory,' that Guidewire ha[d] '*somehow*' obtained and used Accenture's trade secrets." *Id.* at 663 (emphasis added). This use of the term "somehow" in the *Accenture* complaint exemplified the lack of any allegations "that Guidewire obtained [any] information by improper means." *Id.* Finally, the *Accenture* Court highlighted that "there [was] no specific

16

allegation that Guidewire gained access to [the alleged trade secrets] through CNA, and that "there was no allegation that Guidewire either disclosed or used" any trade secret information in developing its competitive product. *Id.*

Thus, there were two primary pleading deficiencies that this Court identified in the *Accenture* complaint: (1) no description of how the defendant improperly obtained the trade secrets; and (2) no allegation of improper disclosure or use of the allegedly secret information in developing the competitive product. Neither of these deficiencies are present in Plaintiff's Amended Complaint. First, Plaintiff provided a description of "how" Defendants allegedly gained access to Plaintiff's IntegRex™ trade secrets—namely, by sending former Eastman employees who had worked on an IntegRex™ plant and become knowledgeable about the IntegRex™ trade secrets to AlphaPet's Alabama facility.[11] (D.I. 15 at ¶ 37) Second, as outlined above, Plaintiff specifically alleged that the IntegRex™ technology was disclosed and used to develop and start up Defendants' Alabama facility. (*Id.* at ¶¶ 62–64)

When it came to allegations of the illicit disclosure and use of trade secrets, the *Accenture* complaint was based strictly on supposition and assumption—it did no more than hint at the alleged wrongful acts, and invite the reader to fill in the blanks with their own version of how or when Guidewire and/or CNA may have wrongfully acted. Plaintiff's complaint, in contrast, alleges a specific illicit pathway (involving its former employees) through which confidential information flowed, and alleges the time period and a set of relevant events (the mid-2009 start-

---

[11]     The *Accenture* court noted that the facts in that case did not follow the "typical" pattern for a trade secret claim, which normally involve "allegations that a former employee of plaintiff had access to trade secrets in the context of his or her employment . . . and later left to compete directly with plaintiff." 581 F. Supp. 2d at 662 n.8. Here, Plaintiff's former employees (who now work for Defendants) are at the heart of Plaintiff's misappropriation claim.

up of the Alabama plant) that was the impetus for the alleged wrongful disclosure and use. While the Amended Complaint does not allege every act taken in support of the alleged wrong-doing, or every time and date when such acts occurred, that level of comprehensive detail is not required by *Twombly*. 550 U.S. at 570 (requiring only "enough facts" to state a plausible claim). When faced with similar allegations, courts have denied motions to dismiss trade secret misappropriation claims. *See, e.g.*, *Reckitt*, 2011 WL 773034 at *5 (refusing to dismiss complaint alleging that defendants used trade secrets in the development and formulation of a generic drug).

### 4. Plaintiff's Trade Secret Misappropriation Claim Is Legally Sufficient

For the reasons discussed above, the Court finds that Plaintiff's trade secret misappropriation claim contains more than a mere "threadbare" recital of the elements of misappropriation, such that a plausible claim has been stated. *Iqbal*, 129 S.Ct. at 1949. Therefore, Plaintiff's misappropriation claim is sufficiently pled under the standards of Rule 8.

### B. Breach of Contract

Plaintiff has asserted a breach of contract claim against only four of the defendants (Plaintiff's three co-parties to the TLA, and IRP). To survive a Rule 12(b)(6) motion to dismiss a breach of contract claim, the plaintiff must have pled: "(1) the existence of a contract, whether express or implied; (2) a breach of an obligation imposed by that contract; and (3) damage suffered by the plaintiff as a result." *Narrowstep, Inc. v. Onstream Media Corp.*, Civil Action No. 5114-VCP, 2010 WL 5422405, at *7 (Del. Ch. Dec. 22, 2010). Defendants make three separate arguments in support of their motion for dismissal: (1) IRP is not a party to the TLA, and thus no contract exists between IRP and Plaintiff; (2) Plaintiff has failed to plead breach of

18

contract against its co-parties to the TLA with sufficient specificity; and (3) Plaintiff has failed to

identify any implied contractual provision in the TLA that might support an implied breach of

contract claim. The first argument goes to whether a contract with IRP even exists, while the

remaining arguments address whether the alleged facts sufficiently support Plaintiff's claims for

breach of the TLA.

### 1. Breach of Contract Against IRP

As previously noted, the TLA was executed by and between Plaintiff and three of the

defendants–IHR, IPR, and IPW. (D.I. 15 at ¶ 13) There is no dispute that IRP was not a party to

the TLA. (*Id.*) Defendants argue that Eastman has therefore "failed to 'show the existence of a

contract' between Eastman and [IRP]." (D.I. 20 at 10) Plaintiff argues that although IRP is not a

signatory to the TLA, "it is reasonable to infer that IRP, through its ownership and control of

[IHR, IPR, and IPW] has breached (and/or induced breach of) the TLA."[12] (D.I. 32 at 8)

Plaintiff cites no authority to support the notion that a parent company can be held liable for an

alleged breach of contract by its subsidiaries, simply by virtue of its "ownership and control" of

those entities.

Under Delaware contract law, "only a party to a contract may be sued for breach of that

contract." *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1180

(Del. Ch. 1999) (citation omitted). A parent corporation can only be held liable for the

performance of a contract by a wholly-owned subsidiary under extremely limited circumstances.

---

[12]     Although Plaintiff's brief makes this passing mention of the possibility that IRP
could be liable for inducing a breach of the TLA, that tort has not been pled in the Amended
Complaint, and therefore will not be addressed by the Court. *See, e.g.*, *UpJohn Co. v. Riahom
Corp.*, 650 F. Supp. 485, 487 (D. Del. 1986) (noting that Delaware law recognizes an
independent tort "known as an 'inducement of breach of contract'").

*Id.* "Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities would be stymied if it did otherwise." *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009). Essentially, a parent will be liable for breach of a contract only in the case of fraud or where the subsidiary is a mere instrumentality or alter ego of a contracting party. *O'Leary v. Telecom Res. Serv., LLC*, Civil Action No. 10C-03-108-JOH, 2011 WL 379300, at *7 (Del. Super. Jan. 14, 2011) (citing *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)).

Even viewing the Amended Complaint in the light most favorable to Plaintiff, it provides no basis for concluding that any of these narrow exceptions apply to IRP, which is indisputably a non-party to the agreement. Therefore, the Court recommends that the claim for breach of contract against IRP be dismissed for failure to state a claim.

### 2. Breach of Express Confidentiality and Non-Use Obligations By IHR, IPR, and IPW

In the Second Count of the Amended Complaint, Plaintiff alleges various breaches of the express terms of the TLA relating to confidentiality, non-disclosure, and non-use obligations. (D.I. 15 at ¶¶ 22–24, 55) Defendants' motion to dismiss these claims is based principally on two arguments: (1) Plaintiff's allegations are too vague to offer Defendants fair notice of the alleged breach; and (2) Plaintiff does not specifically identify what role each accused defendant played in the alleged breach. (D.I. 20 at 11–12) As with Defendants' motion to dismiss the trade secret misappropriation claims, Defendants again seek to impose a heightened pleading burden on Plaintiff, which is at odds with the less stringent requirements of Rule 8.

Although Defendants argue that because of the vagueness in Eastman's Amended Complaint, they are unable to discern the nature of Eastman's breach of contract claims, in their briefing Defendants manage to identify three different categories of contractual duties that Eastman alleges are breached: "informing employees about the status of Eastman's alleged trade secrets ([D.I. 15 at] ¶ 22), not soliciting trade secrets from former Eastman employees (*id.* [at] ¶ 24), and not using unlicensed Eastman trade secrets (*id.* [at] ¶ 23)." (D.I. 20 at 11) While Defendants are apparently on notice of the multidimensional nature of the alleged breaches of the TLA, they nevertheless argue that there is insufficient underlying factual support in the Amended Complaint for "the first two categories."[13] (D.I. 20 at 11)

The TLA includes, *inter alia*, two different restrictions on the manner in which Eastman trade secrets can be used—one substantive (whereby only the enumerated set of licensed trade secrets could be used), and one geographic (whereby no licensed trade secrets were to be used under any circumstances in the U.S.). (D.I. 71 at 91) Again, Plaintiff alleges that both of those restrictions were violated when the former Eastman employees, who had been transferred to IHR, IPR, and IPW under the terms of the TLA and the MBSA, were sent by Defendants to the U.S. to aid AlphaPet in designing and starting up the competing PET plant in Alabama. (D.I. 15 at ¶ 37) These employees allegedly brought with them the protected information about IntegRex™ technology (the alleged trade secrets), and by disclosing/using this information, Defendants breached the TLA. (*Id.* at ¶ 39)

---

[13] Because "the first two categories" relate to purported breaches of confidentiality provisions of the TLA, Defendants presumably do not dispute that Plaintiff has at least alleged a claim for breach of the non-use/non-transfer obligations of the TLA. Defendants' apparent concession that Plaintiff has sufficiently alleged such a claim would, in and of itself, allow a large portion of Plaintiff's breach of contract claim to survive Defendants' motion to dismiss.

It is reasonable to infer, accepting these allegations as true, that Defendants failed to inform the employees transferred from Eastman of the obligations of the TLA, and solicited their assistance on behalf of or in connection with AlphaPet and IRP. That inference is bolstered by Defendants IHR and IPR's apparent failure to confirm, after a May 2009 request in a letter from Eastman, (1) that they were in compliance with the terms of the TLA, and (2) that none of the individuals with knowledge of Eastman's IntegRex™ technology would work on the AlphaPet plant in Alabama. (*Id.* at ¶ 34) The Court finds that this level of detail is sufficient to assert plausible claims for breach of contract and to enable Defendants to formulate their defense.

Defendants' arguments are similar to those that were recently rejected by this Court in *JJCK, LLC v. Project Lifesaver Int'l*, Civ. No. 10–930–LPS, 2011 WL 2610371 (D. Del. July 1, 2011). In *JJCK*, the "central dispute [was] whether [the plaintiff] ha[d] alleged enough facts to establish that [defendant's] conduct rises to the level of a breach of the [agreement-at-issue]." *Id.* at *7. The *JJCK* plaintiff alleged that the defendant violated several sections of the agreement-at-issue "by publicly disparaging the [plaintiff and its products] in blog posts, press releases, and statements issued to its member [public service agencies]." *Id.* The defendant challenged the sufficiency of these allegations, arguing that the plaintiff "must describe the 'specific statements alleged to be false or disparaging' or otherwise provide the necessary factual basis for this conclusion." *Id.* After drawing all inferences in favor of the plaintiff, this Court refused to dismiss the breach of contract claim, noting that it provided "fair notice of the nature of the claims against it." *Id.* at *9. This was so, even though the *JJCK* plaintiff did not identify the specific text of the disparaging statements at issue, because the plaintiff *did* allege a number of other facts about the statements, such as where and when they were made, and which person or

company made them. *Id.* at \*8–9.

So too is the case here. While Plaintiff has not, for example, cited specific statements in which Defendants' management solicited information about IntegRex™, Plaintiff does allege that Defendants "direct[ed]" the transferred employees to improperly disclose information "related to Eastman's IntegRex™ PET technology to Defendants AlphaPet and IRP during the design, start-up or operation of AlphaPet's melt-to-resin PET manufacturing process." (D.I. 15 at ¶ 39) Thus, although there are undoubtedly additional facts relevant to Plaintiff's claim that have not been pled, Defendants cannot credibly argue that they are not on notice as to the basic grounds of Plaintiff's breach of contract claim.

As such, Defendants' reliance upon *iCard Stored Value Solutions, L.L.C. v. West Suburban Bank*, No. 4:07-CV-1539 CAS, 2008 WL 619236 (E.D. Mo. Mar. 3, 2008), is misplaced. (D.I. 20 at 11) The *iCard* plaintiff filed a six-count petition alleging various state law claims, including breach of contract. *Id.* at \*1. For its breach of contract claim, the *iCard* plaintiff pled only that under the contract at issue, it was "to provide certain confidential and proprietary information" to the defendant and that the defendant was "to perform certain services." *Id.* at \*2. With regard to the alleged breach, the plaintiff alleged only that the defendant "refused to perform under the agreed terms," which were not stated in the *iCard* complaint. *Id.* The *iCard* court determined that the plaintiff's "vague references to 'certain services' and 'certain information'" were not sufficient "to meet the *Twombly* standard." *Id.*

These vague references bear no resemblance to the detail contained in Plaintiff's Amended Complaint. Similar to the facts encountered in *Accenture*, discussed in detail above, the *iCard* defendant was left to guess what might constitute the "information" and "services" that

were the subject of the breach of contract claim or what terms of the contract were allegedly violated. In contrast, Plaintiff here has specifically identified the information (*i.e.*, information relating to its unlicensed IntegRex™ technology) and individuals (*i.e.*, the transferred employees) and circumstances (*i.e.*, the creation and start-up of AlphaPet's plant in Decatur, Alabama) that give rise to its breach of contract claim and the terms of the TLA it alleges have been breached. Thus, *iCard* does not compel dismissal.

Defendants also argue that because Plaintiff failed to "differentiate among [IHR, IPR, and IPW] or identify what role any defendant played in the alleged breach," it has failed to adequately plead its claim. (D.I. 20 at 12) For its part, Plaintiff contends that most of the detailed information that Defendants seek is "solely in the[ir] possession," and that it has alleged a breach by (at least) each of its co-parties to the TLA. (D.I. 32 at 9–10)

As an initial matter, the Amended Complaint specifically alleges breach by each of IHR, IPR, and IPW. (*See* D.I. 15 at ¶ 55 ("The actions of Defendants [IHR, IPR,] *and* [IPW] described above constitute breach of the terms of the TLA . . . .") (emphasis added)) Moreover, there is only one identified contract at issue that is alleged to have been breached—the TLA. In the TLA, IHR, IPR, and IPW are collectively defined as the "Purchasers," and are referred to collectively throughout the document. (D.I. 8, ex. B at 1)[14] Only a single party (IHR) appears to have signed the TLA on behalf of the Purchasers, and any notices pursuant to the agreement were to be sent

---

[14]     The Court has considered the content of the TLA as part of its inquiry into the legal sufficiency of the Amended Complaint. *See, e.g., Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (noting that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on [that] document"). Neither party has questioned the authenticity of the TLA, which was submitted as an exhibit by Defendants. (*See* D.I. 8, ex. B)

to the same person at the same address in order to reach all the Purchasers. (*Id.* at 22, 26) Thus, at this stage, addressing allegations collectively to these three parties is at least consistent with the manner in which they appear to have been characterized in the TLA. Considering this factual context, along with Plaintiff's allegations regarding the "integration" of the Defendants following the execution of the TLA, (D.I. 15 at ¶ 27), and the other specific facts pled in the Amended Complaint, the failure to identify which specific defendant each breaching employee worked for is not fatal at this stage. This is particularly true because Plaintiff cannot currently be expected to know all of the details as to which particular Defendant company each of the transferred employees was ultimately assigned to, given that discovery has not yet commenced. *See, e.g.*, *Accenture*, 581 F. Supp. 2d at 662 ("It is not common for a trade secret misappropriation plaintiff to know, prior to discovery, the details surrounding the purported theft.").

Moreover, the Amended Complaint and the TLA are distinguishable from the complaint and contract at issue in *Rodriguez v. OneWest Bank*, No. CV09-2361-PHX-NVW, 2010 WL 550760 (D. Ariz. Feb. 16, 2010), relied upon by Defendants. Specifically, Defendants note that the *Rodriguez* court dismissed a complaint because it described actions by "'[the defendants] without identifying whether OneWest or IndyMac [the two named defendants] allegedly performed the specific acts' alleged to constitute a breach." (D.I. 20 at 11–12 (quoting *Rodriguez*, 2010 WL 550760 at *2)) However, the *Rodriguez* complaint did "not identify what contract [d]efendants allegedly breached and whether the claim [was] for breach of a written or oral contract or breach of the covenant of good faith and fair dealing implied in one of the contracts, or some or all of these." *Id.* As such, it was impossible for the two defendants in *Rodriguez* to sort out what each was actually accused of doing. *Id.* Here, there is one multi-party

25

contract (the TLA) at issue, in which IHR, IPR, and IPW appear to have been closely linked together. As to those defendants, the nature of the alleged breach has been sufficiently described to allow each of them to respond. Thus, the *Rodriguez* decision, which does not apply or cite Delaware law, does not clearly support dismissal of Plaintiff's claims for breach of the TLA.

### 3. Breach of Implied Confidentiality Provisions

Defendants correctly note that Plaintiff's only allegation related to its implied breach of contract theory is that "[t]he actions of Defendants [IRP, IHR, IPR, and IPW] described above constitute breach of implied confidentiality provisions of the TLA under Delaware law." (D.I. 20 at 12 (citing D.I. 15 at ¶ 56)) Plaintiff responds that "[t]o the extent that the Court may find that the pled facts do not establish an express duty that has been breached, Eastman alleges in the alternative that those same activities establish an implied duty of confidentiality that was breached when the parties sought, obtained, and used Eastman's intellectual property in view of a TLA that was evidently written to protect the confidentiality of that intellectual property." (D.I. 32 at 11–12) The Court concludes that such "alternative" pleading is insufficient under Delaware law to state a claim for breach of an implied contract provision.

Although the Delaware Supreme Court "has recognized the occasional necessity of implying contract terms," such action should be taken only "rare[ly]" and cautiously. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotations and citations omitted). As Plaintiff acknowledges, "to allege a breach of an implied contractual provision, a plaintiff must allege 'a *specific implied contractual obligation*, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" (D.I. 32 at 11 (citing *Zwanenberg Food Group (USA) Inc. v. Tyson Refrig. Proc'd Meats, Inc.*, Civ. No. 08-329-LPS, 2009 WL 528700, at *4

26

(D. Del. Feb. 27, 2009) (emphasis added)).

Plaintiff never identifies the *specific implied contractual obligation* it contends should be read into the TLA—all that Plaintiff appears to allege in its response brief is that a blanket provision of implied confidentiality should apply generally to the TLA, and that it is broad enough (whatever its terms may be) to cover Defendants' alleged acts recited in the Amended Complaint. That is insufficient to state a claim for breach of an implied provision. *See, e.g., N.K.S. Distribs., Inc. v. Tigani*, C.A. No. 4640-VCP, 2010 WL 2178520, at *7–9 (Del. Ch. May 28, 2010) (dismissing a claim for breach of the implied covenant where the plaintiff did "not allege the existence of any specific, implied contractual obligations"); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006) (holding that the plaintiff failed to state a claim upon which relief could be granted where it failed to "identif[y] any implied contract term that it would have the trial court read into the contract").

Moreover, even if Plaintiff had sufficiently identified the scope and content of an implied contractual provision, it would be inappropriate to read an implied duty of confidentiality into the TLA, given that the TLA expressly addresses the issue of confidentiality. *See, e.g., Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play."); *accord Dow Chem. Canada Inc. v. HRD Corp.*, 656 F. Supp. 2d 427, 446–47 (D. Del. 2009). An example of how this principle is applied in Delaware law is found in *Kuroda v. SPJS Holdings, L.L.C.*, Civil Action No. 4030-CC, 2010 WL 925853 (Del. Ch. Mar. 16, 2010). *Kuroda* was a complex contractual dispute among several parties, where the defendants asserted a number of

27

counterclaims against the plaintiff. *Id.* at *1. Among those counterclaims was a breach of the implied covenant of good faith and fair dealing, which the *Kuroda* defendants alleged that the plaintiff violated when he used and disclosed certain of defendants' confidential information to solicit investors and disparage the defendants. *Id.* at *6. The *Kuroda* defendants argued that the plaintiff made several implied promises when entering the relevant LLC agreement, including not to misappropriate trade secrets, not to breach the express confidentiality terms in other related agreements, and not to encourage others to breach those confidentiality provisions.[15] *Id.* at *10. The plaintiff moved to dismiss this claim under 12(b)(6). *Id.* at *6.

In granting the plaintiff's motion, the Delaware Chancery Court refused to "apply the implied covenant of good faith and fair dealing to impose upon [plaintiff] a duty of confidentiality under the LLC Agreement," because it determined that "any use of the implied covenant to insert a contractual duty of confidentiality into the LLC Agreement would be an override of the express terms of that agreement." *Id.* at *10–11. The *Kuroda* Court highlighted that "the LLC Agreement specifically excluded any duties relating to confidentiality, while at the same time intimately related agreements . . . included such duties." *Id.* at *11. Similarly, the TLA includes a number of express confidentiality provisions that impose duties of confidentiality; under Delaware law, it is those express duties that must form the basis for any claim for breach of the confidentiality provisions of the TLA. *Id.*

Thus, I find that Plaintiff has failed to sufficiently identify any implied contractual term that should be read into the TLA, and has likewise failed to state a claim under the law for breach

---

[15] As noted above, Plaintiff has not outlined any implied promises that Defendants allegedly made pursuant to the TLA, in contrast to the allegations in *Kuroda*.

of any such implied provision.

## IV. CONCLUSION

For the foregoing reasons, I recommend that the Court GRANT Defendants' motion to dismiss the breach of contract claim against IRP and to dismiss the claim for breach of an implied contractual term of confidentiality without prejudice, but otherwise DENY the motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order In Non-Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, http://www.ded.uscourts.gov/StandingOrdersMain.htm.

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE